IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| JAMES DORA,<br>Institutional ID No. 176444,<br><br>    Plaintiff,<br><br>v.<br><br>KELLY ROWE, *et al.*,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§   CIVIL ACTION NO. 5:20-CV-270-BQ<br>§<br>§<br>§<br>§<br>§ |

**FINDINGS, CONCLUSIONS, AND**
**RECOMMENDATION AND ORDER OF TRANSFER**

The Honorable James Wesley Hendrix, United States District Judge, transferred this case to the undersigned United States Magistrate Judge (ECF No. 6) and, in accordance with said order, the undersigned conducted preliminary screening as described in 28 U.S.C. §§ 1915(e)(2) and 1915A(b). The Court determined that the following claims asserted by pro se Plaintiff James Dora survive preliminary screening—those against: (1) Lubbock County Detention Center (LCDC) Officers Mauro Castillo and Selena Garcia for excessive force; (2) a Doe LCDC Officer and LCDC Officer Garcia for deliberate indifference to serious medical needs; (3) Lubbock County Sheriff Kelly Rowe for denial of visitation, reduced food portions, and mail tampering; and (4) LCDC Officer Tracy Landeros for tampering with privileged mail.[1] ECF No. 33. Consequently, the Court entered an order requiring these Defendants to answer or otherwise plead to Dora's claims. *Id.* All Defendants served with process have timely answered. ECF Nos. 41, 43, 45, 57.

---

[1] Dora was a pretrial detainee when the incidents forming the bases of his claims occurred at LCDC. *See* ECF No. 26. He originally named a Doe Defendant in connection with the mail tampering claim, but subsequent filings reveal that Defendant's name is Tracy Landeros. ECF Nos. 26, 33, 37, 49, 50, 57.

As discussed below, the identity of another Doe Defendant Dora contends denied him medical care has yet to be determined and, as a result, the Court has not ordered that officer to be served. Nevertheless, the undersigned recommends that Dora be permitted to conduct limited discovery to learn Doe's name.

As of today's date, all parties have not consented to jurisdiction by the magistrate judge. Upon review of Defendants' Answers, it is the opinion of the undersigned that this matter must be transferred to the district judge for further proceedings.

## I. Discussion

The undersigned previously found that Dora's claims for excessive force, deliberate indifference to serious medical needs, denial of visitation, reduced food portions, and mail tampering survive preliminary screening.[2] *See* ECF No. 33, at 22. The Court briefly addresses each claim below.

### A. Excessive use of force.

Dora's use of force claims arise under the Fourteenth Amendment because the incident occurred while he was a pretrial detainee. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (abrogating lower courts' application of Eighth Amendment excessive force standards in *Hudson v. McMillian*, 503 U.S. 1 (1992) to pretrial detainees). To sufficiently state an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The reasonableness of the force used must be assessed "from the perspective and with the knowledge of the defendant officer" and with "deference to policies and practices needed to maintain order and institutional security." *Id.* at 399–400. In determining the objective reasonableness of an officer's use of force, a court should consider the following non-exclusive factors: (1) "the relationship between the need for the use of force and the amount of force used";

---

[2] The Court concluded that Dora's claims for denial of a sack lunch, failure to investigate grievances, false disciplinary charges, denial of certain privileges, discrimination, retaliation, excessive bail, and any claim against Defendants in their official capacities failed to state a claim for relief and dismissed them through the same order. *See* ECF Nos. 33, 34.

(2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Id.* at 397.

Dora contends that on February 18, 2020, Officer Castillo used excessive force "by kicking [him] on the right side of [his] head 'AFTER' [he] was already hand cuffed and laying face down on the ground . . . ." Am. Compl. 9, ECF No. 26;[3] *see* Tr. 7:21–8:6, ECF No. 32. Dora alleges that he suffered "a cut on the right side of [his] forehead" due to Officer Castillo's purported action. Tr. 7:24–25; *see* Am. Compl. 9.[4]

Dora further claims that the following day, February 19, sometime between 8 a.m. and noon, Officer Garcia used excessive force "by shooting [him] twice with the '[p]epper ball gun'" as officers "escorted [Dora] 'back' from [LCDC's] . . . 'processing area.'" Am. Compl. 10; *see* Tr. 13:1–14:2. According to Dora, he was "hand cuffed down into the 'Duck walking' position, not being a threat to anyones [sic] safety" when Officer Garcia purportedly shot the pepper balls. Am. Compl. 10. At the *Spears* hearing, Dora clarified that one pepper ball hit the wall and burst, surrounding him "in a whole cloud of gas." Tr. 14:7–10. The other ball hit Dora directly. Tr. 13:18–19. As a result of the incident, Dora claims his eyes burned and his vision became blurry, and that the blurred vision continued to the time of his appearance at the *Spears* hearing.[5] Tr. 15:16–16:15.

---

[3] Page citations to Dora's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[4] In connection with the incident involving Officer Castillo, Dora was criminally charged with assault of a public servant. At the time of the *Spears* hearing, this charge was still pending. For that reason, the Court focused on developing the facts of Dora's allegations *after* this incident concluded, i.e., once Dora claimed Officer Castillo had him cuffed and on the ground. Tr. 2:17–3:11.

[5] The authenticated records contain video footage of the incident involving Officer Castillo. As for the February 19 incident, however, Lubbock County merely provided a copy of its pepper ball training slides—the county did not supply any video footage of the incident itself.

Accepting Dora's allegations as true, as the Court must at this stage of the proceedings, his factual assertions state claims sufficient to survive preliminary screening, i.e., Fourteenth Amendment excessive force claims against Officers Castillo and Garcia. As to each use of force incident, Dora alleges that: he did not present a threat to the officers because he was handcuffed; the purported force was excessive to the need; and the officers did not temper their uses of force. *See* Am. Compl. 9–10; Tr. 7:21–8:6, 13:1–14:10. The first, third, fourth, fifth, and sixth *Kingsley* factors (i.e., the relationship between the need for the use of force and the amount of force used, any effort made by the officer to temper or limit the amount of force, the threat to institutional order reasonably perceived by the officer, the severity of the security problem at issue, and plaintiff's active resistance) therefore weigh in Dora's favor at this stage.[6]

Similarly, the second *Kingsley* factor (i.e., the extent of plaintiff's injury) weighs in Dora's favor, if only slightly, as to the incident involving Officer Garcia. Dora maintains he experienced blurry vision and burning in his eyes. Tr. 15:16–16:15. Ordinarily, the temporary effects of pepper spray—burning eyes and skin, irritation to nose and throat, etc.—constitute *de minimis* injuries. *Bradshaw v. Unknown Lieutenant*, No. 02-10072, 2002 WL 31017404, at *1 (5th Cir. Aug. 21, 2002) (reasoning that prisoner's allegation "he suffered burning eyes and skin for approximately 24 hours, twitching of his eyes, blurred vision, irritation of his nose and throat, blistering of his skin, rapid heartbeat, mental anguish, shock and fear as a result of the use of mace," constituted *de minimis* injuries, particularly where prisoner did not plead facts alleging the force used "was objectively unreasonable under the circumstances"). Here, however, Dora claims that he continued to experience blurred vision, at least to the time of his appearance at the *Spears* hearing,

---

[6] The Court observes, however, that as to the incident involving Officer Castillo, authenticated video footage reflects that Dora was not compliant prior to Castillo's purported use of force. To the contrary, Dora actively disobeyed orders and physically resisted Officer Castillo. Nevertheless, Dora contends, and the video footage shows, that at the time Officer Castillo allegedly used force, Dora lay face down on the ground with his hands cuffed behind his back.

as a result of the incident. Tr. 15:16–16:15. This allegation, in combination with Dora's contention that he did not pose a threat to Officer Garcia and she used a pepper ball gun (as opposed to spraying mace), dictates a finding in favor of Dora on the second factor, at least during the screening phase. *Cf. Bradshaw*, 2002 WL 31017404, at *1; *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) ("Pepper balls are rifle-fired projectiles that break into pieces upon impact and release oleoresin capsicum powder (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages." (internal quotation marks omitted)).

In contrast, the second *Kingsley* factor weighs in Officer Castillo's favor concerning his February 18 use of force. Dora asserts he suffered a cut to the right side of his forehead. Tr. 7:24–25; *see* Am. Compl. 9. Dora's injury is undeniably minor. On balance, however, weighing Officer Castillo's alleged actions—gratuitous force used on a handcuffed and no-longer-resisting detainee lying face down on the ground—the undersigned finds that, for screening purposes, Dora has pleaded adequate facts demonstrating Officer Castillo used force maliciously and sadistically for the purpose of causing harm. *See Kingsley*, 576 U.S. at 400 (explaining that under the Fourteenth Amendment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically" (internal quotation marks omitted)).

Because the *Kingsley* factors largely weigh in Dora's favor as to each use-of-force incident, Dora's claims against Officers Castillo and Garcia are sufficient to survive preliminary screening. *See, e.g., Buck*, 549 F.3d at 1289 (affirming district court's denial of qualified immunity to defendant who shot plaintiff with pepper ball gun while "she was lying on the ground" and was not "resist[ing] or evad[ing] arrest"); *Williams v. City of Houston*, No. H-16-3342, 2019 WL 2435854, at *10 (S.D. Tex. June 11, 2019) (denying officer's summary judgment motion where

although "summary judgment evidence shows that [detainee] had earlier resisted arrest and the blood test, that resistance could not justify [officer's] later use of force if resistance had ceased," and there remained a factual dispute as to "whether the force used was reasonably necessary to restrain [detainee]"); *Luke v. Beagron*, No. 16-13461, 2016 WL 8740486, at *12–13 (E.D. La. Dec. 28, 2016) (recommending that pretrial detainee's excessive force claim proceed beyond preliminary screening where detainee suffered a pinched nerve as a result and he alleged he did not resist—"[i]f [his] version of events is accurate, it appears that no use of force was in fact necessary"), *R. & R. adopted by* 2017 WL 1407719 (E.D. La. Apr. 20, 2017).

### B. Denial of adequate medical care.

Dora's claims for the denial of medical treatment similarly arise under the Fourteenth Amendment.[7] An inmate or detainee seeking to establish a Fourteenth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463

---

[7] Because Dora was a pretrial detainee at the time of the incident giving rise to his claim, his rights derive from the Fourteenth Amendment, not the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (stating that pretrial detainee's rights "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment"). However, the standard for deliberate indifference to serious medical needs is essentially the same for both pretrial detainees and post-conviction prisoners. Thus, cases applying the Eighth Amendment are still relevant to the Court's analysis.

F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Dora raises two discrete medical care claims, both of which stem from the uses of force described above. Am. Compl. 10–11. As a result of the February 18 episode, Dora asserts that he had pepper spray on his face and a cut on his forehead. *See* Tr. 7:24–25, 10:20–22. In Dora's view, "it was clear that [he] needed help . . . [for his] face." Tr. 12:3–4. Dora alleges that, following the incident, a Doe Officer came to his cell and asked if he desired medical attention. Am. Compl. 11. Dora responded "yes" and, according to Dora, the Officer initially removed Dora

from the cell for escort. *Id.* Dora contends that as the Officer "back[ed] [Dora] out of the cell, [however,] . . . [the Officer] abruptly stopped and said, 'You know what? F*** that, I'm not taking you anywhere!'" *Id.* (cleaned up). Dora claims the Doe Officer "then pushed [him] back into the cell, closed the door," and refused to obtain medical treatment for Dora. *Id.*; *see* Tr. 9:1–11:17.

Further, Dora alleges that after shooting him with the pepper balls on the 19th, Officer Garcia denied Dora medical treatment. Am. Compl. 10; Tr. 14:22–25. Specifically, Dora asserts the pepper spray caused his face and eyes to burn, and he asked Officer Garcia to "get [the pepper spray] out of [his] face," but instead, Garcia "walked off." Tr. 15:3–6. Dora contends that his "vision is still blurred to this day" from the pepper ball incident.[8] Tr. 15:18–22.

Accepting Dora's allegations as true, as the Court must at this stage, he has pleaded sufficient facts regarding each claim to survive preliminary screening. *See, e.g.*, *Vinson v. Caddo Corr. Ctr.*, No. 20-1425, 2021 WL 1015851, at *2, *4 (W.D. La. Feb. 19, 2021) (finding inmate's medical care claim against nurses survived screening, where he alleged that he described his symptoms and had visible ailments, but nurses did not obtain care for him), *R. & R. adopted by* 2021 WL 982320 (W.D. La. Mar. 16, 2021); *Fountain v. Thaler*, No. 6:13cv958, 2015 WL 5168775, at *16 (E.D. Tex. Sept. 2, 2015) (finding prisoner's claim that he "repeatedly asked [defendant] for mental health care and she . . . had him fill out forms and talked to him, but [did] not provide[] him with any care" stated a claim sufficient to require an answer).

The Court reaches this conclusion as to the Doe Officer despite Dora's inability to name the individual. Generally, a plaintiff's "use of a 'John Doe' is disfavored . . . ." *Green v. Doe*, 260

---

[8] Relying on a case from the Eleventh Circuit, this Court recently observed that "preventing a detainee from decontaminating himself is an independent form of excessive force." *Brooks v. Taylor Cnty.*, No. 1:20-CV-049-H, 2021 WL 4458380, at *13 (N.D. Tex. Sept. 29, 2021) (citing *Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008), *overruled in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)). Dora, however, specifically characterizes the foregoing claims against Officers Doe and Garcia as ones for deliberate indifference to serious medical needs. Am. Compl. 10–11; Tr. 14:22–15:15.

F. App'x 717, 719 (5th Cir. 2007) (per curiam). Nevertheless, the Fifth Circuit has held that courts should permit a plaintiff to conduct discovery regarding a Doe defendant where plaintiff's failure to identify is not "the result of contumaciousness or an attempt to delay the proceedings." *Cowart v. Dall. Cnty. Jail*, 439 F. App'x 332, 333 (5th Cir. 2011) (per curiam). Lubbock County identified seven current or former employees of LCDC who were working in or present near the cell where Dora alleges the Doe Officer denied him medical treatment on February 18, 2020. ECF No. 48. Dora asserts he was not able to open his eyes at the time he interacted with the Doe Officer due to the pepper spray. ECF No. 50, at 2–3. Thus, other than identifying Doe as male, Dora cannot provide detail as to any identifying characteristics of the individual to narrow Lubbock County's list. *Id.* at 1–3. Dora asserts that video surveillance would provide the necessary information and asks the Court to require Lubbock County to provide video footage. *Id.* at 4–6. In response, however, Lubbock County avers that any video from the date in question is not available because by the time Lubbock County received an authenticated records request from the Court, any video "had been purged from the system" in accordance with its policy.[9] ECF No. 51, at 2.

"It is conceivable that, if he were allowed to conduct discovery, [Dora] would be able to adequately identify" Doe Officer. *Murphy v. Kellar*, 950 F.2d 290, 293 (5th Cir. 1992). "The information that would enable [Dora] to identify [the individual who purportedly denied him medical attention]—e.g., duty rosters and personnel records—may be readily obtainable," even if video footage is no longer available. *Id.* Thus, the undersigned recommends that the district judge grant Dora's pending motion (ECF No. 50) and permit Dora an opportunity to conduct limited discovery to adequately identify Doe Officer.

---

[9] Lubbock County does not specify what its maintenance policy is, nor does it state the date on which any video (to the extent it existed) was destroyed. *See* Decl. of Assistant Chief Ryan Braus 1–2, ECF No. 51.

### C. Claims for denial of visitation, reduced food portions, and mail tampering against Sheriff Rowe, as well as the mail tampering claim against Officer Landeros, survive.

Dora alleges that on February 19, 2020, Sheriff Rowe threatened him by stating "Im [sic] going to try to starve you and make it look like suicide! . . . [Y]ou will regret the day that you laid your hands on one of mines [sic]!" Am. Compl. 8. Further, Dora alleges that Sheriff Rowe threatened to revoke all of Dora's privileges, including visitation and mail. *Id.* at 7–8. Dora asserts that, shortly thereafter, he was denied visitation rights, his mail was tampered with, and his food portions were "short." *Id.* at 7–9; Tr. 23:13–39:15, 49:17–50:22.

Specifically, Dora contends "they short[ed] [his] portions" for six or seven months, causing him to lose thirty pounds. Tr. 25:7, 22; *see* Tr. 23:13–24:25; Am. Compl. 8. Further, Dora alleges that he has not been permitted any visits, other than from his attorney, for approximately one year. Tr. 48:18–49:5. According to Dora, family members attempted to visit him, but LCDC officials denied the visits for "[d]ifferent reasons," including that family members needed to "come at a certain time" and that Dora does not have "visiting rights." Tr. 48:7–12. Dora asserts that he wrote a grievance concerning the visitation denials, and in response, officials stated they "had some mess-ups." Tr. 48:13–17.

Dora also alleges that "[a]ll [his] mail" was delayed. Tr. 36:2–10. More specifically, Dora claims that Officer Landeros diverted letters intended for his criminal defense attorney to the Lubbock County District Attorney (DA). Tr. 37:14–17, 49:17–50:22. Dora acknowledges that his letters ultimately reached his attorney, but not before they were sent to the DA. Tr. 37:14–38:7. Dora states that LCDC officials reported the error was due to a "training issue," but he believes that was merely an "excuse." Tr. 50:17–18. Dora ultimately attributes the mail tampering to Sheriff Rowe's alleged directives. Tr. 35:3–38:20, 39:12–15.

In sum, Dora specifically avers that "[e]verything [Rowe] threatened, it happened." Tr. 39:5–15. That is, Dora asserts that Sheriff Rowe ordered LCDC officials to commit the foregoing acts, after publicly threatening to do so. *See id.*; Am. Compl. 8. The Court therefore analyzes the foregoing claims specifically as they relate to Sheriff Rowe.

### 1. *Claims against Sheriff Rowe.*

Although supervisory officials are generally not liable for the acts of their subordinates, liability can exist where a supervisor (1) affirmatively participates in an act that causes a constitutional deprivation or (2) implements an unconstitutional policy that results in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). Dora alleges that Sheriff Rowe personally participated in the foregoing alleged constitutional violations by directing his subordinates to commit the acts.

Because "pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of basic human needs." *Hare*, 74 F.3d at 639 (internal quotation marks omitted). "The constitutional rights of a pretrial detainee, [however], flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Id.* "Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 644–45). Where Dora, a pretrial detainee, complains about "a particular act or omission of one or more officials," i.e., Defendant Rowe's alleged threats and involvement in carrying-out said threats, the Court construes his claims as "episodic act[s] or omission[s]." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999); *see Mayes v. Valdez*, No. 3:15-CV-3424-M-

BH, 2017 WL 4075184, at *5 (N.D. Tex. Aug. 21, 2017) ("Because Plaintiff's factual allegations do not suggest a 'systematic failure' in failing to provide nutritionally adequate meals to detainees at the Jail, he presents an episodic act or omission claim."), *R. & R. adopted by* 2017 WL 4022890 (N.D. Tex. Sept. 13, 2017). To state a viable claim against an individual defendant in an episodic act or omission case, a detainee "must establish that the official(s) acted with subjective deliberate indifference to prove a violation of [his] constitutional rights." *Olabisiomotosho*, 185 F.3d at 526 (internal quotation marks and citation omitted). "Subjective deliberate indifference means the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* (internal quotation marks omitted).

        *a.  Inadequate food portions.*

The Constitution requires that detainees receive "reasonably adequate" food. *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988) (citation omitted). Whether an institution's meals fall below the constitutional "threshold depends on the amount and duration of the deprivation." *See Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (discussing a food deprivation claim under the Eighth Amendment). Here, Dora's factual assertions—that his food portions were short and he lost thirty pounds—state a claim sufficient to survive preliminary screening. *See, e.g., Wilson v. Johnson*, 385 F. App'x 319, 320 (4th Cir. 2010) (per curiam) (concluding that prisoner's allegation that prison served inadequate food portions, causing him to lose weight, was sufficient to survive screening); *cf. McGarrah v. Kimbrow*, No. 3:14–CV–2088–B–BK, 2015 WL 105228, at *5 (N.D. Tex. Jan. 6, 2015) (dismissing at screening claim alleging pretrial detainee received reduced food portions where he did "not contend that he lost weight or that he suffered any physical injury as a result"); *McCallister v. Valdez*, No. 3–10–CV–1309–D, 2010 WL 3766807, at *3 (N.D. Tex. Aug. 18, 2010) (same), *R. & R. adopted by* 2010 WL 3766779 (N.D. Tex. Sept. 23, 2010).

### b. Blanket denial on visitation privileges.

A prison official's denial of visitation may implicate the right of free association under the First Amendment. *Von Minden v. Jankowski*, 268 F. App'x 352, 353 (5th Cir. 2008) (per curiam); *but see Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (reasoning that "freedom of association is among the rights least compatible with incarceration" and therefore "[s]ome curtailment of that freedom must be expected"). Nevertheless, an official's blanket denial of visitation rights may be "valid if it is reasonably related to legitimate penological interests." *Von Minden*, 268 F. App'x at 353 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see Overton*, 539 U.S. at 132 (explaining that the Court did not need to define the bounds of the right to association, where "the challenged regulations [bore] a rational relation to legitimate penological interests"). In determining whether a prison regulation implicating a constitutional right is valid, a court should consider whether: (1) "the regulation has a valid, rational connection to a legitimate governmental interest;" (2) there are "alternative means" available to prisoners "to exercise the asserted right;" (3) accommodating the constitutional right impacts the "guards and inmates and prison resources;" and (4) "ready alternatives" to the regulation exist. *Von Minden*, 268 F. App'x at 353–54.

Dora essentially contends that Sheriff Rowe ordered LCDC officials to deny Dora all visits from anyone other than his attorney. Tr. 47:23–49:2. Dora states that despite not being on restriction for six months, officials nevertheless continued to deny him visitation rights. Tr. 48:13–17. Dora implicitly disputes LCDC officials' proffered reason for the denials—"some mess-ups" (Tr.48:1–17), and contends he has not been allowed any visits for approximately one year. Tr. 48:18–49:2. Liberally construing Dora's allegations in his favor, as the Court must during this initial stage, Dora's denial-of-visitation claim against Sheriff Rowe survives preliminary screening. *Cf. Overton*, 538 U.S. at 131–32 (declining to hold "that any right to intimate

association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners," and indicating that a court must analyze whether the regulation bears a rational relationship to a legitimate penological interest); *Von Minden*, 268 F. App'x at 354 (concluding district court properly awarded summary judgment to defendant, where the *Turner* factors dictated a finding that visitation regulation was reasonably related to a legitimate government interest).

### c. Tampering with privileged mail.

"A prison official's interference with a prisoner's legal mail may violate the prisoner's constitutional right of access to the courts." *Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993). "Additionally, such interference may violate the prisoner's First Amendment right to free speech— i.e., the right to be free from unjustified governmental interference with communication." *Id.* Dora does not directly contend that his legal position was harmed, thus implicating a right of access to the courts. *See* Tr. 37:22–38:17. Instead, Dora alleges that, at the direction of Sheriff Rowe, Officer Landeros sent privileged letters intended for Dora's attorney, to "the opposition"—i.e., the Lubbock County DA. In this context, the Court construes Dora's allegations as raising a First Amendment claim.[10] *See, e.g.*, *Mitchell v. Peoples*, 10 F.4th 1226, 1230–31 (11th Cir. 2021) (explaining that a prisoner's allegation that jail officials opened outgoing legal mail implicated the First Amendment, and the court must determine whether "the officials' practice of opening [prisoner's] clearly marked legal mail outside his presence was enough to chill, inhibit, or interfere with [prisoner's] ability to speak, protest, and complain openly to his attorney so that it infringed his right to free speech" (internal quotation marks and citation omitted)); *Gassler v. Wood*, 14 F.3d

---

[10] As discussed *supra* at note 4, criminal charges remained pending against Dora at the time of the *Spears* hearing. Dora's purported privileged communications with his attorney apparently related to those pending charges. *See* Tr. 37:6–38:7. Based on Dora's recent change of address (ECF No. 56), the undersigned believes state criminal proceedings against Dora have concluded. Thus, the Court does not intend its findings, conclusions, and recommendation to foreclose Dora's ability to raise other potential mail claims.

406, 409 (8th Cir. 1994) ("Had the authorities improperly shared appellants' outgoing mail with unauthorized persons—for example, with a newspaper reporter or a prisoner's business rival—the situation might be different" and may have violated the First Amendment.); *Brewer*, 3 F.3d at 825–26 (providing "that for decades this court has acknowledged a prisoner's right to be free from completely arbitrary censorship of his outgoing mail," particularly legal mail, and prisoner therefore stated "cognizable First Amendment claim"); *Taylor v. Sterrett*, 532 F.2d 462, 473–74 (5th Cir. 1976) (holding that there is "no justification whatsoever for opening or reading [outgoing] correspondence addressed to the courts, prosecuting attorneys, parole or probation officers, and identifiable attorneys"); *see also Adams v. Carlson*, 488 F.2d 619, 630–31 (7th Cir. 1973) (recognizing "that the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context" and "communications by post between an inmate and his attorney are [therefore] sacrosanct, subject only to tests on incoming mail for the presence of contraband which fall short of opening it when the inmate is not present").

At this stage, the undersigned finds that Dora's mail tampering claim against Sheriff Rowe—i.e., that Rowe directed LCDC officials to tamper with and/or delay Dora's legal mail and divert it to the Lubbock County DA—survives preliminary screening. *See Mitchell*, 10 F.4th at 1230–31; *Taylor*, 532 F.2d at 473–74.

    2. *Claim against Officer Landeros.*

Dora avers that Officer Landeros is the LCDC employee who actually diverted his privileged legal mail, which was intended for his criminal defense attorney, to the Lubbock County DA. Tr. 37:14–17, 49:17–50:22. For the same reasons discussed in connection with the claim

against Sheriff Rowe, Dora's privileged mail tampering claim against Officer Landeros survives screening. *See Mitchell*, 10 F.4th at 1230–31; *Taylor*, 532 F.2d at 473–74.

Given the timeframe set forth by the district judge in the referral order, it appears prudent to transfer the case back to the district judge for implementation of a scheduling order. Because Defendants have asserted the affirmative defense of qualified immunity, it is the undersigned's **RECOMMENDATION** that the United States District Judge enter a limited scheduling order, requiring Defendants to file a motion for summary judgment with supporting evidence, for the purpose of making a preliminary determination on qualified immunity. *See* ECF No. 41, at 4 (raising several defenses, including qualified immunity); ECF No. 43, at 5 (same); ECF No. 45, at 5 (same); ECF No. 57, at 2 (same). Alternatively, the undersigned recommends that a Rule 16 scheduling order be entered, setting dates certain for pretrial deadlines and filing dispositive motions. Finally, the undersigned recommends that the district judge grant Dora's motion requesting discovery to identify Doe Defendant (ECF No. 50) and allow Dora to conduct limited discovery in that regard.

It is therefore **ORDERED** that the transfer of this case to the United States Magistrate Judge is terminated and the case is hereby transferred back to the docket of the United States District Judge. This case shall hereinafter be designated as Civil Action Number 5:20-CV-270-H.

## II.    Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made,

state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: December 10, 2021.

_____
D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE